UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

UNITED STATES OF AMERICA

v.                                                    Case No:  2:14-cr-23-FtM-38DNF

BRIAN RALPH HERRON

_____

## REPORT AND RECOMMENDATION

**TO THE UNITED STATES DISTRICT COURT**

### I.      Introduction

This cause is before the Court on Defendant Brian Ralph Herron's Motion to Suppress (Doc. 22) filed on July 11, 2014.  The Government filed a Response to Defendant's Motion to Suppress (Doc. 27) on July 25, 2014.  This matter was referred to the Court for a report and recommendation and an evidentiary hearing was held before the undersigned on September 25, 2014.  A Transcript (Doc. 50) of the proceedings (hereinafter referred to as "Tr. 1" followed by the appropriate page number) was filed on November 5, 2014.  A second hearing was held before the undersigned on October 1, 2014, and another Transcript (Doc. 51) of the proceedings (hereinafter referred to as "Tr. 2" followed by the appropriate page number) was filed on November 5, 2014.  Defendant is charged with knowingly possessing one or more matter(s) which contain visual depiction which was produced using materials that had been transported using any means or facility of interstate or foreign commerce by an means including by computer, where the production of such visual depiction involved the use of a minor engaging in sexually explicit conduct, and such visual depiction is of such conduct, in violation of 18 U.S.C. § 2252(a)(4)(B) and (b)(1). (Doc. 1).  Defendant is requesting the Court to suppress all evidence derived from the execution of the search warrant of his residence on August 8, 2013, as well as

statements he made during his interview on the same date.  For the reasons explained below, the Court recommends that Defendant's motion be **DENIED**.

## II.    Evidence

At the two hearings, the Government called three witnesses: Special Agent Joseph Cecchini, Special Agent Daniel Ward, and Special Agent Patricia Enterline.  The Government introduced eight exhibits into evidence: Exhibit 1, a copy of the "302" report drafted on February 27, 2013; Exhibit 2, a copy of the "302" report drafted on April 24, 2013; Exhibit 3, a copy of the "302" report drafted on May 8, 2013; Exhibit 4, an image of the undercover log from the FBI's office in Tulsa, Oklahoma; Exhibit 5, a DVD containing the investigation documents from the undercover investigation designated UOC 12202; Exhibit 6, subpoena disclosure information from Comcast for IP address 76.101.105.220; Exhibit 7, a copy of the search warrant affidavit and application for Defendant's residence; and Exhibit 8, a CD containing an audio recording of Defendant's interview on August 19, 2013, and a transcript of the interview.  Defendant did not introduce any exhibits.

### A)  Testimony of SA Joseph Cecchini

On direct examination, SA Cecchini testified as follows.  SA Cecchini is a special agent with the Federal Bureau of Investigations in Tulsa, Oklahoma. (Tr. 1 p. 6).  He investigates crimes against children including the online exploitation of minors. (Tr. 1 p. 6).  He has been employed by the FBI for 17 years and has been investigating the exploitation of children since 2001.  (Tr. 1 p. 6-7).  His duties include performing online undercover investigations and local investigations. (Tr. 1 p. 7).  As part of his online undercover investigations he goes online and identifies people that are distributing, trafficking, trading child pornography, attempting to exploit children online, including in chat investigations, and peer-to-peer investigations. (Tr. 1 p.

7). SA Cecchini explained that peer-to-peer is a type of software that allows people to share files between each other. (Tr. 1 p. 7). Using a peer-to-peer program, the FBI is able to determine people that are trafficking and distributing child pornography. (Tr. 1 p. 7).

As part of peer-to-peer investigations, SA Cecchini uses the program Limewire, a peer-to-peer protocol. (Tr. 1 p. 8). Using Limewire, SA Cecchini is able to go online and determine if people are sharing files that indicate child pornography. (Tr. 1 p. 8). When people sharing child pornography files are identified, the FBI's version of Limewire allows the FBI to download the child pornography files from that one person, meaning the download comes from a single IP address. (Tr. 1 p. 8). This is called a single-source download. (Tr. 1 p. 8). The FBI's single-source download version of Limewire is different than the standard version of Limewire available to the public, which allows users to download from multiple IP addresses at the same time. (Tr. 1 p. 8). The FBI's version of Limewire is hardwired to only download files from one IP address at a time. (Tr. 1 p. 8). SA Cecchini testified that an IP address is akin to a phone number, which identifies a computer's place on the internet. (Tr. 1 p. 8). In order to send a file to a computer, the IP address must be known. (Tr. 1 p. 8).

SA Cecchini identified the Government's Exhibit 1 as a "302" form that he completed on February 27, 2013. (Tr. 1 p. 9). A "302" is FBI nomenclature for a report. (Tr. 1 p. 10). The "302" completed on February 27 was in regards to an investigation that had occurred on the same day regarding an IP address 75.67.203.86 which was suspected to be located in Sagamore Beach, Massachusetts. (Tr. 1 p. 10-11). The IP address 75.67.203.86 was suspected to be in Sagamore Beach, Massachusetts because the FBI's version of Limewire has a geo-locator that can identify the general area of where an IP address is located. (Tr. 1 p. 11).

SA Cecchini explained as part of an investigation he collects digital evidence including the images or movies that are downloaded, text or digital files that identify the information such as session time, the session number, the IP address, the location, and the ISP provider. (Tr. 1 p. 12). Limewire records the IP address from which it downloading a file. (Tr. 1 p. 12).

As part of his investigation, SA Cecchini also takes handwritten notes. (Tr. 1 p. 13). SA Cecchini identified the Government's Exhibit 4 as a handwritten log that is kept in Tulsa, and which memorializes undercover sessions conducted by the FBI and task force officers. (Tr. 1 p. 13). In the log, each line indicates an undercover session. (Tr. 1 p. 13). The log entries are memorialized at the time the undercover session is conducted. (Tr. 1 p. 13).

The handwritten log contains an entry for February 27, 2013. The entry contains the number assigned to the actual undercover contact. (Tr. 1 p. 14). The entry specifies that Limewire was used as part of an undercover investigation conducted by the FBI. (Tr. 1 p. 14). The line also identifies the FBI office associated with the location of the IP address identified in the undercover investigation, which was Boston for the February 27, 2013 investigation. (Tr. 1 p. 15). These notes in the log are made after conducting the actual online investigation, but prior to writing the "302" report. (Tr. 1 p. 15).

SA Cecchini identified Government's Exhibit 2 as a "302" report he completed on April 24, 2013. (Tr. 1 p. 16). The April "302" report identified Naples, Florida as the suspected location of the IP address from which the files were downloaded. (Tr. 1 p. 16). The IP address on the April "302" report is 75.67.203.86, which is the same IP address contained in the "302" report from February 27, 2013. (Tr. 1 p. 16). SA Cecchini explained that the reason the IP address on the April "302" report was the same as the February "302" report is because it was simply left on the form by mistake. (Tr. 1 p. 17). SA Cecchini knew that the April "302" report had the

wrong IP address based on a review of the digital evidence uncovered in the investigation. (Tr. 1 p. 17).

At some point SA Cecchini realized that the IP address on the April "302" report was incorrect.  (Tr. 1 p. 20).  On May 8, 2013, he completed a new "302" report reflecting the correct IP address from the April undercover investigation. (Tr. 1 p. 20).  The new "302" report listed the suspect IP address as 76.101.108.220. (Tr. 1 p. 20).  Otherwise, the new "302" report is identical to the April "302" report. (Tr. 1 p. 21).  SA Cecchini testified that he issued a subpoena to Comcast for IP address 76.101.108.220 on May 9, 2013, after completing the replacement "302" report on May 8, 2014. (Tr. 1 p. 24-25).

On cross examination, SA Cecchini testified that he was not involved in the preparation of the search warrant affidavit in this case. (Tr. 1 p. 27).  He did not have any communications with Officer Patricia Enterline prior to the date the search warrant was issued. (Tr. 1 p. 27).  SA Cecchini testified that Officer Enterline received the information from his undercover investigations via a packet which he prepared that contained digital evidence, disks, pictures, as well as the information returned from the subpoena served on Comcast. (Tr. 1 p. 28).  The packet also included both the April "302" report and the May "302" report. (Tr. 1 p. 28).  SA Cecchini testified that the replacement May "302" report indicates on its first page, second page, and third page that the April "302" report was factually incorrect. (Tr. 1 p. 30).  SA Cecchini testified that he sent the original, incorrect "302" report for the sake of completeness. (Tr. 1 p. 37).

**B)  Testimony of SA Daniel Ward**

SA Ward testified as follows.  SA Ward is a special agent with the FBI and is currently the Child Exploitation Task Force Coordinator. (Tr. 1 p. 38).  His duties entail identifying and

prioritizing the needs of the task force, arranging funds for those needs, and going over search warrants. (Tr. 1 p. 38).  Also, he helps execute search warrants. (Tr. 1 p. 38-39).

On August 19, 2013, SA Ward participated in the execution of a search warrant for 2840 Southeast 17th Avenue, Cape Coral, Florida. (Tr. 1 p. 39).  He did not participate in the receiving, signing, or drafting of the search warrant itself, but was a member of the entry team that approached the house. (Tr. 1 p. 39).  The search warrant was executed at approximately 6:00 a.m. (Tr. 1 p. 39).  SA Ward knocked on the door and a female resident, Deborah Broderick, answered. (Tr. 1 p. 39).  She was asked to step outside, and after she did, SA Ward and the rest of the entry team went through the house clearing it and checking for anybody that was inside. (Tr. 1 p. 39). SA Ward observed Defendant in entry way of the home. (Tr. 1 p. 40).  SA Ward asked Defendant if he would be willing to step outside while the house as being secured, and Defendant did so without speaking. (Tr. 1 p. 40).  SA Ward also observed an elderly female in a back bedroom. (Tr. 1 p. 41).

After the residence was cleared, SA Ward went outside with another special agent and stood in the driveway with Defendant while the other members went inside and labeled the rooms for photographs. (Tr. 1 p. 41).  SA Ward described this practice as a standard operating procedure to prevent anybody else from entering the house. (Tr. 1 p. 41).  While outside SA Ward spoke with Defendant. (Tr. 1 p. 41).  Defendant asked if he was under arrest and SA Ward told him that he was not. (Tr. 1 p. 41).  Defendant asked SA Ward the reason why law enforcement was at the residence, and SA Ward advised him that they had a search warrant for the home. (Tr. 1 p. 41). Defendant then reviewed the search warrant. (Tr. 1 p. 42).  Upon reading it he stated, "Oh, this is for child pornography." (Tr. 1 p. 42).  He then stated that he did not look at child pornography, but that he only looks at models. (Tr. 1 p. 42).  Another special agent on the scene then asked

Defendant if he was referring to LS Models, a known series of photographs of child pornography that is often distributed over the internet. (Tr. 1 p. 42).  The LS Models series contains images of prepubescent females in various stages of undress from fully clothed all the way down to provocative poses, completely nude. (Tr. 1 p. 42).  Defendant stated that LS Models is one of the websites he views and downloads, but that it is not child pornography. (Tr. 1 p. 43).  SA Ward told Defendant he was free to go while they were outside in the driveway. (Tr. 1 p. 43).  Defendant was at no point placed in handcuffs. (Tr. 1 p. 43).  SA Ward then went back in the house and began searching it for evidence. (Tr. 1 p. 43).

On cross examination, SA Ward testified that LS Models also contains images of fully clothed individuals and that not all of the images on the website constitute child pornography. (Tr. 1 p. 44-45).  SA Ward testified that Defendant stated that he goes to LS Models and downloads models. (Tr. 1 p. 45).  SA Ward testified that a report he signed regarding the case did not mention that Defendant said he downloaded files from LS Models, only that the website was one he looked at. (Tr. 1 p. 46-47).

SA Ward testified that he was wearing a pair of blue jeans or tactical pants and a t-shirt and bulletproof vest that identified himself as law enforcement at the time he helped execute the search warrant. (Tr. 1 p. 48).  SA Ward testified that there were five officers, including himself, on the entry team and a few other officers were on the perimeter around the house. (Tr. 1 p. 48-49).  In total, nine officers were listed on the operations order. (Tr. 1 p. 49).  SA Ward testified that this number does not include officers from Lee County Forensics. (Tr. 1 p. 49).

SA Ward testified that all of the members of the entry team were armed and wore clothing similar to himself. (Tr. 1 p. 50).  SA Ward testified that all of the officers were armed, and that he assumed that they, like himself, had their firearm out as they entered the house. (Tr. 1 p. 50-

51).  SA Ward testified that he could not recall if he had already drawn his firearm when he encountered Defendant coming towards the entry way. (Tr. 1 p. 51).  SA Ward testified that he does not typically draw his weapon until he enters the house, and in this case, Defendant and Deborah both exited the house before he entered. (Tr. 1 p. 51).  SA Ward testified that Defendant would have been in a position to see him with his gun drawn. (Tr. 1 p. 51-52).

SA Ward explained that he was the officer that asked Defendant to step outside of the home and Defendant stepped out and went to the driveway. (Tr. 1 p. 52).  SA Ward testified that Defendant remained in the presence of law enforcement the entire time he was in the driveway. (Tr. 1 p. 52).  SA Ward testified that when he returned outside Defendant was standing beside a single officer, SA Cox. (Tr. 1 p. 53).

On redirect examination, SA Ward testified that he has viewed the LS Model series. (Tr. 1 p. 59).  SA Ward explained that the images are in a series where the model is progressively taking off more clothing in each photograph. (Tr. 1 p. 61).  SA Ward testified that the law enforcement officers on perimeter were not visible to Defendant. (Tr. 1 p. 61).  SA Ward testified that Defendant and Deborah Broderick were told they were free to leave, and Deborah, in fact, left the scene. (Tr. 1 p. 62).  SA Ward testified that he came outside to the driveway after clearing the residence to preserve the integrity of the home and to make sure nobody reentered the house that was not supposed to. (Tr. 1 p. 62).  SA Ward testified that after the house was cleared he holstered his firearm. (Tr. 1 p. 63).

### C)  Testimony of SA Patricia Enterline

On direct examination, SA Enterline testified as follows.  She works for the Cape Coral Police Department and is currently assigned to the FBI's Child Exploitation Task Force at the Fort Myers office. (Tr. 2 p. 4).  She has been assigned to the FBI's Child Exploitation Task Force

since 2011. (Tr. 2 p. 4).   Her job entails investigating crimes against children, specifically, internet-related crimes and child pornography. (Tr. 2 p. 4).   She conducts undercover operations and receives leads from other FBI investigators. (Tr. 2 p. 4).

SA Enterline testified that when she receives a lead from another FBI investigator, she will be notified electronically and then the evidence will be sent in a packet via FedEx to her office. (Tr. 2 p. 5).   In the lead packet she will receive an undercover CD containing the undercover session, the subpoena associated with the undercover session, and the report written by the agent. (Tr. 2 p. 5).   She will take the undercover CD, which contains the images that were downloaded and screen shots from the actual undercover session, and go into the undercover room where she can view the child pornography and compare them. (Tr. 2 p. 5-6).

In July 2013, SA Enterline received a lead packet from SA Cecchini of the FBI in Oklahoma. (Tr. 2 p. 6). Upon receiving the packet, SA Enterline reviewed the evidence, including the screen captures, the capture logs, the images that contain the hash values, and the IP addresses associated with it, and the subpoena. (Tr. 2 p. 6).   She compared the IP address on the subpoena response, which was from Comcast to the IP address on the capture logs. (Tr. 2 p. 6).   She also compared the files from the undercover session with the subpoena. (Tr. 2 p. 8).

After doing this comparison, SA Enterline viewed all of the images to confirm that they were child pornography images, and then she wrote a description of each image for her notes. (Tr. 2 p. 9).   Afterwards, she continued to follow up the investigation by conducting surveillance and trying to find out who resided at the house identified in the subpoena return. (Tr. 2 p. 9).   At the conclusion of her investigation she wrote the search warrant for the house. (Tr. 2 p. 9).   In writing the search warrant, SA Enterline used the report written by SA Cecchini that was sent in

the lead packet to document his description of what was done in the case. (Tr. 2 p. 9).  She also used her notes to write the description of the images viewed. (Tr. 2 p. 9).

SA Enterline testified that she did not realize that there were two "302" reports in this case until much later in her investigation, after she had executed the search warrant. (Tr. 2 p. 10). SA Enterline testified that at the time she did not know, but she must have used the "302" report with the IP address 75.67.203.86 because it is the IP address that is in the search warrant. (Tr. 2 p. 10).  SA Enterline testified that this is not the correct IP address because the actual physical evidence of the undercover session referenced the IP address of 76.101.108.220, and the subpoena response for that IP address specified that it was used by an address in Cape Coral. (Tr. 2 p. 10).  SA Enterline testified that she had the wrong "302" report in front of her when she drafted the search warrant. (Tr. 2 p. 11).

SA Enterline testified that she realized that she had used the wrong report to draft her search warrant when she was reviewing the evidence and preparing the case to present to the AUSA's office for the grand jury. (Tr. 2 p. 12).  She then realized that there were identical reports for the same case, one with the wrong IP address on it. (Tr. 2 p. 13).  The difference between the reports is that the replacement "302" report has in quotation underneath the body of the report "Other UOC-12202 replacement 302". (Tr. 2 p. 13).  SA Enterline testified that she does not normally read that section, but that she reads the body of the "302" report, the dates in the report, and the agent's name. (Tr. 2 p. 14).  The only differences in the body is that the IP addresses are different and the undercover session number is different. (Tr. 2 p. 14).

After discovering the mistake, SA Enterline contacted the Government and explained what had occurred. (Tr. 2 p. 14).  The mistake was explained to the grand jury and the case went

forward. (Tr. 2 p. 14).  SA Enterline testified that the mistake did not give her any benefit, but actually the opposite. (Tr. 2 p. 14).

SA Enterline testified that the search warrant was executed on August 19, 2013. (Tr. 2 p. 16).  SA Enterline described that the warrant was executed, the occupants of the residence were asked to step outside, the house was cleared, evidence was taken, and Defendant was interviewed. (Tr. 2 p. 16).  SA Enterline testified that Deborah Broderick was also interviewed. (Tr. 2 p. 16). SA Enterline was not on the entry team, but was on perimeter. (Tr. 2 p. 17).  After the home was secured SA Enterline entered the house. (Tr. 2 p. 17).  When she approached the house SA Enterline saw Defendant standing with SA Cox and SA Ward, and an agent was standing with Deborah Broderick. (Tr. 2 p. 17).  SA Enterline explained that they were free to leave if they liked, but agents stood next to them because they did not want them to walk about freely in case they could secure a weapon from the house or an automobile. (Tr. 2 p. 17).  Officers also stood next to Defendant and Deborah Broderick for the preservation of evidence. (Tr. 2 p. 17).  SA Enterline testified that no one was handcuffed when she approached the house and no one was in law enforcement's custody. (Tr. 2 p. 18).

SA Enterline testified that Defendant was brought back into the residence and interviewed. (Tr. 2 p. 19).  Task Force Officer (TFO) Justin Spense[1] made initial contact with Defendant while SA Enterline cleared a space in the home office to conduct the interview. (Tr. 2 p. 18).  SA Enterline testified that they told him they were executing a search warrant and that he was free to leave. (Tr. 2 p. 18).  The entire statement of Defendant was recorded and entered into evidence as the Government's Exhibit 8. (Tr. 2 p. 18).  SA Enterline testified that she left

---

[1] TFO Spense's name is spelled "Spence" in the Government's Exhibit 8.  The Court utilizes the spelling used in the transcripts of the motion to suppress hearing.

during the statement and that she only had personal knowledge through page 37 of Exhibit 8. (Tr. 2 p. 21).

SA Enterline testified that Defendant was told during the interview that law enforcement was on a fact-finding mission, they were there conducting a search warrant of the residence for child pornography, that he was free to leave, that he was not under arrest, and they asked if they could speak with him. (Tr. 2 p. 21).   Law enforcement asked Defendant some background questions, and Defendant explained that he and Deborah were the only people with access to the computer and that Deborah works during the day, and that he's home most of the day. (Tr. 2 p. 22).  According to SA Enterline, Defendant was evasive with some of his answers. (Tr. 2 p. 22). After a while, Defendant asked for some water. (Tr. 2 p. 22).   SA Enterline accompanied Defendant to get the water. (Tr. 2 p. 22).   SA Enterline did not go back to the interview with Defendant afterwards. (Tr. 2 p. 22).

While Defendant was being interviewed, law enforcement was forensically examining a laptop computer that was found in the main area of the home. (Tr. 2 p. 22-23).   Defendant told law enforcement that he had an old computer which law enforcement found in the garage. (Tr. 2 p. 23).   Defendant was made aware towards the conclusion of the interview that law enforcement had found the old computer. (Tr. 2 p. 23).   Defendant made some statement that if anything illegal was found on the computer that it was his and not Deborah's. (Tr. 2 p. 24).

SA Enterline testified that the tone of the interview was like any other conversation, but as time went on the agents appeared to get frustrated. (Tr. 2 p. 25).   The agents told Defendant that he was lying and stated that if it was not him then it was Deborah. (Tr. 2 p. 25).  SA Enterline testified that Defendant was allowed to get up to get some water, to use the restroom, and he was allowed to smoke cigarettes. (Tr. 2 p. 27).   SA Enterline testified that officers went with

Defendant when he went to the restroom and to get water. (Tr. 2 p. 27).  This was done for officer safety and evidence preservation, and Defendant was not handcuffed at any point. (Tr. 2 p. 27). SA Enterline testified that Deborah Broderick was interviewed by law enforcement, and afterwards she got ready and then she left the residence to go to work. (Tr. 2 p. 28).

SA Enterline testified that Defendant said several times during the interview that he was going to go to jail, and the agents told him multiple times that he was not under arrest and would not be going to jail. (Tr. 2 p. 28).  SA Enterline testified that law enforcement had no plans to take anyone into custody at any point. (Tr. 2 p. 30).

SA Enterline testified that as law enforcement was finishing up, TFO Spense approached her and told her that Defendant had made some statements that were concerning him that Defendant may hurt himself or the other occupants of the home. (Tr. 2 p. 31).  SA Enterline contacted the Cape Coral Police Department to conduct a Baker Act investigation. (Tr. 2 p. 31). SA Enterline was not involved in the Baker Act investigation but just told the police officers what Defendant had said. (Tr. 2 p. 31).  Defendant was Baker Acted and eventually returned to the residence where he was arrested months later. (Tr. 2 p. 32).

On cross examination, SA Enterline testified that the allegations of probable cause with respect to the search warrant are contained in paragraphs 27 to 43 of the search warrant. (Tr. 2 p. 33).  SA Enterline testified that she knew as of July 12, 2013, that the IP address connected to Defendant's residence was 76.101.108.220, as she had received the information from Comcast at that time. (Tr. 2 p. 37).   SA Enterline testified that paragraph 29 is inaccurate as the IP address listed had nothing to do with the residence in Cape Coral, Florida. (Tr. 2 p. 42).  SA Enterline testified that paragraph 32 is inaccurate due to the IP address. (Tr. 2 p. 43).  SA Enterline testified that paragraph 31 which states "SA Joseph Cecchini and your affiant subsequently reviewed the

results of the captured logs and the completed files downloaded—or file downloads, and confirmed that the IP address from which the images files were downloaded as 75.67.203.86" was inaccurate. (Tr. 2 p. 44-45).  SA Enterline testified that if paragraphs 29 to 32 were removed there would be no probable cause alleged in the search warrant affidavit of the search of the Broderick residence. (Tr. 2 p. 47).

SA Enterline testified that Defendant was not read *Miranda* rights because he was not in custody and was free to leave. (Tr. 2 p. 48).  SA Enterline testified that law enforcement determined where the interview would be held and not Defendant. (Tr. 2 p. 58).  SA Enterline testified that there were 11 law enforcement officers in Defendant's residence. (Tr. 2 p. 65).

On redirect examination, SA Enterline testified that when she received the lead from SA Cecchini she did not receive any phone calls, emails, or other contact from SA Cecchini that the "302" report was incorrect. (Tr. 2 p. 79).

### III.    Analysis

### a)  Whether the search warrant was invalid

Defendant argues that the search warrant affidavit drafted by SA Enterline failed to establish probable cause that child pornography was downloaded from an IP address associated with Ms. Broderick's residence in Cape Coral, Florida. (Tr. 2 p. 90).  Defendant argues that law enforcement knew that IP address 75.67.203.86, the IP address contained in the April "302" report, was not assigned to Ms. Broderick's residence in Cape Coral and, thus, law enforcements' representations in the search warrant were, at the very least, made in reckless disregard for the truth. (Doc. 22 p. 6).

The Government acknowledges that the IP address contained in SA Enterline's search warrant affidavit was incorrect and characterizes the mistake as a typographical or scrivener's

error. (Doc. 27 p. 3). The Government argues, however, that the search warrant is still valid because the error was not made deliberately or recklessly, but merely accidently, or at most, negligently. (Doc. 27 p. 3).  Alternatively, the Government argues that even if the Court finds that the typographical error was committed deliberately or recklessly, the search warrant is still valid because the affidavit's remaining content is sufficient to establish probable cause. (Doc. 27 p. 4).

To void a search warrant, a defendant must show by a preponderance of evidence that (1) the affiant included in the warrant affidavit "a false statement knowingly and intentionally, or with reckless disregard for the truth," and (2) "the affidavit's remaining content is insufficient to establish probable cause." *United States v. Finley*, 612 F.3d 998, 1002 (8th Cir. 2010) (quoting *Franks v. Delaware*, 438 U.S. 154, 155-156 (1978)).  Intentional or reckless false statements or omissions will invalidate a warrant if the true and complete facts would have negated a finding of probable cause. *See United States v. Novaton*, 271 F.3d 968, 987 (11th Cir. 2001) and *Madiwale v. Savaiko*, 117 F.3d 1321, 1327 (11th Cir. 1997).

In this case, there is no dispute that the search warrant affidavit contained false statements. The issue the Court must determine is whether the false statements were included in the affidavit "knowingly and intentionally" or with "reckless disregard for the truth."  At the first hearing, SA Cecchini testified that he investigated IP addresses 75.67.203.86 and 76.101.108.220 and uncovered file names consistent with child pornography during both investigations. SA Cecchini subpoenaed Comcast for information regarding the account related to IP address 76.101.108.220, and was informed that the IP address belonged to Ms. Broderick at 2840 S.E. 17th Avenue, Cape Coral, Florida 33904. (Tr. 1 p. 24-25; Gov.'s Ex. 6).   When preparing the "302" report of his undercover investigation into 76.101.108.220 in April 2013, SA Cecchini accidentally identified

the IP address belonging to Ms. Broderick as 75.67.203.86. (Tr. 1 p. 17).  SA Cecchini testified that this mistake was due to his reliance on a "302" form he had made in conjunction with his investigation into 75.67.203.86 in February 2013. (Tr. 1 p. 17).

SA Cecchini eventually realized his mistake and on May 8, 2013, made a corrected version of the "302" report reflecting that the correct IP address for the April undercover investigation was 76.101.108.220. (Tr. 1 p. 20).  When SA Cecchini forwarded his investigation evidence to SA Enterline in Cape Coral, Florida, he sent both the erroneous "302" report made in April 2013 and the corrected "302" report made in May 2013. (Tr. 1 p. 37).  SA Enterline testified that she mistakenly relied on the incorrect "302" report from April 2013 when she drafted the search warrant affidavit. (Tr. 2 p. 11).

This issue boils down to whether SA Enterline was reckless when she included the incorrect IP address in the search warrant affidavit.  The Court finds that SA Enterline, although arguably negligent, was not reckless in including false statements in the search warrant affidavit. The Court has reviewed both the incorrect "302" report from April 2013 and the replacement "302" report from May 2013 and disagrees with Defendant's characterization that the replacement "302" report is conspicuously indicated.  On the first page of the replacement "302" report, besides the changes to the session number and IP address in the body of the text, the only indication that it is a replacement "302" report is the phrase "Other (UOC-12202 replacement 302))" which is located outside the main body of the text and in the footer of the page. (Ex. 3 p. 1).  While pages 2 and 3 of the replacement "302" report indicate that the form is a "Corrected 302 for UOC-12202, serial 2238 was incorrect factually", this language is located outside the body of the text and is contained in the form's header. (Ex. 3 p. 2-3). Given the close similarity

of the "302" reports, SA Enterline's reliance on the incorrect one was not conduct rising to the level of recklessness.

This finding is further supported by the fact that SA Enterline was given no warning that the packet forward to her contained two "302" reports.  According to the testimony of law enforcement at the hearings, it is rare for a replacement "302" report to be generated, as SA Cecchini testified that the replacement "302" report he drafted in this case was the first one he has generated in his 17 year career.  (Tr. 1 p. 30).  SA Cecchini never contacted SA Enterline to inform her that there was a replacement 302 report. (Tr. 1 p. 33).  Given the rarity of replacement "302" reports, the Court cannot find that SA Enterline acted recklessly in relying on the replacement "302" report, especially in light of the fact that she was not forewarned of the investigation packet containing more than one.

As SA Enterline was not reckless in including the false statements in the search warrant affidavit, the Court does not need to address the second part of *Franks* to determine if the search warrant affidavit minus the false statements, provides probable cause.  Accordingly, the Court will not suppress any evidence on the grounds that the search warrant was invalid.

### b) Whether Defendant was subject to custodial interrogation in violation of *Miranda*

Defendant argues that he was in custody when he was interviewed by law enforcement in his house while the search warrant was being executed. (Doc. 22 p. 7).  Defendant contends that law enforcement failed to afford him his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966) before conducting a custodial interrogation and thus, his statements should be suppressed. (Doc. 22 p. 7).

The Government responds that Defendant voluntarily engaged in a non-custodial interview with law enforcement while the search warrant was being executed. (Doc. 27 p. 4).  The

Government argues that a reasonable person would believe they were free to go under the circumstances of this case. (Doc. 27 p. 8).

A defendant's statement while the defendant is in custody may only be introduced into evidence if the defendant was given his *Miranda* rights prior to the interrogation. *United States v. Gomes*, 279 F. App'x 861, 868 (11th Cir. 2008). These rights include the right to remain silent; that statements can and will be used against them in a court of law, that the individual has a right to an attorney during questioning; and if that individual cannot afford an attorney, one will be appointed. *Miranda v. Arizona*, 384 U.S. 436, 178-479 (1966). However, before *Miranda* warnings are required, a defendant must be in custody and under interrogation. *Id*. (citing *United States v. Castro,* 723 F.2d 1527, 1530 (11th Cir. 1984) (per curiam)). A defendant who voluntarily gives a statement to law enforcement in a non-custodial situation need not be advised of his *Miranda* rights. *Missouri v. Seibert*, 542 U.S. 600, 608 (2004).

A suspect is considered to be in custody for the purposes of *Miranda* when there has been "a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *California v. Beheler*, 463 U.S. 1121, 1125 (1983) (quotation marks omitted). Courts must look to the totality of the circumstances surrounding the interrogation or interview to determine whether "'a reasonable man in [the suspect's] position would feel a restraint on his freedom of movement to such extent that he would not feel free to leave.'" *United States v. Brown*, 441 F.3d 1330, 1347 (11th Cir. 2006) (quoting *United States v. McDowell*, 250 F.3d 1354, 1362 (11th Cir. 2001) (quotation marks and alterations omitted). Some factors to consider include the location of the questioning, its duration, the types of statements made during the questioning, the presence of physical restraints, and the release of the suspect at the end of the questioning. *Howes v. Fields*, 132 S.Ct. 1181, 1189 (2012) (citations omitted).

In this case, the evidence shows that the interview in question occurred in Defendant's home office. (Tr. 2 p. 58).   The interview began at approximately 6:46 a.m. and lasted approximately one and a half hours. (Gov.'s Ex. 8).   There were approximately eleven law enforcement officers in Defendant's residence while he was being interviewed. (Tr. 2 p. 65).   At the outset of the interview, TFO Spense informed Defendant that "no one's in any trouble and no one's going to jail today . . .everyone in the house is free to leave.   We are simply serving the search warrant . . . on a quest for evidence. (Gov.'s Ex. 8 p. 2).   TFO Spense informed Defendant multiple times that he was not under arrest; that he was not going to jail; and that his interview was strictly voluntary. (Gov.'s Ex. 8 p. 2, 39, 40, 41, 45, 55, 79, 80, 97).   Defendant was not handcuffed or restrained during the interview, it lasted less than an hour and a half, and Defendant was not taken into custody at the end of the questioning.

The test to determine custody is an objective one, the actual or subjective beliefs of the defendant and the interviewing officer on the issue of whether the defendant is free to leave are "irrelevant."   *United States v. Brown,* 441 F.3d at 1347 (citing *United States v. Moya*, 74 F.3d 1117, 1119 (11th Cir. 1996)).   "[U]nder the objective standard, the reasonable person from whose perspective 'custody' is defined is a reasonable *innocent* person."   *Id.* (citing *United States v. Moya*, 74 F.3d at 1119) (quotation marks omitted, emphasis added).   The Court must consider all of the facts and weigh the evidence presented.   *United States v. Brown*, 441 F.3d 1330, 1349 (11th Cir. 2006). No one fact is determinative of the issue of whether the interview was custodial or not. *Id*.

Given the circumstances in this case, the Court finds that Defendant was not in custody at the time of the interview and, thus, was not entitled to *Miranda* warnings.   When a defendant is unambiguously told he is free to leave and is not in custody, then generally, courts reach the

conclusion that the defendant was not in custody during an interrogation. *United States v. Gomes*, 279 F. App'x. 861, 868 (11th Cir. 2008) (citing *Brown*, 441 F.3d at 1347). Here, Defendant was told on several occasions throughout the course of the interview that he was free to leave, that he was not under arrest, and that he was not going to jail. Further, the fact that Defendant was not in custody is further supported in that the interview occurred in Defendant's home. *See United States v. Brown*, 441 F.3d 1330, 1348 (11th Cir. 2006), *United States v. Gomes*, 279 F. App'x 861, 868 (11th Cir. 2008) (finding that a neutral and familiar setting is a significant factor weighing against a court finding a custodial interrogation)). Defendant was never placed in handcuffs or otherwise restrained during the interview, which lasted a little under an hour and a half. At the end of questioning, Defendant was not arrested. Under such circumstances, a reasonable, innocent person would believe they were free to leave.

Defendant argues that he was in custody because law enforcement questioned him in an accusatory, sarcastic manner in a police dominated atmosphere and because Defendant was not granted freedom of movement throughout his home during the interview. (Tr. 2 p. 93-95). The Court disagrees with Defendant's assessment of these circumstances. The Court has listened to the audiotape recording of Defendant's interview and does not find that the tone and tenor of law enforcement's questioning is of such an overbearing quality as to have made the interview custodial. While an officer's knowledge or beliefs may bear upon the issue of custody if they are conveyed to an individual being questioned, "[e]ven a clear statement from an officer that the person under interrogation is a prime suspect is not, in itself, dispositive of the custody issue, for some suspects are free to come and go until the police decide to make an arrest." *Stansbury v. California*, 511 U.S. 318, 325 (1994). Thus, law enforcements accusations that Defendant was lying about his role in the downloading of child pornography did not alter the nature of the

interview from a voluntary interview to a custodial interrogation.  Similarly, the presence of the eleven officers did not make the interview custodial.  Only three law enforcement officers participated in the interview of Defendant, and for a long stretches the interview was conducted by only two, as SA Enterline ceased participating about 28 minutes into the interview. (Tr. 2 p. 20).  The interview occurred in a room apart from the other officers who were conducting the search and there is no evidence that their presence had an overbearing effect on Defendant so that he felt he was not free to leave.

Additionally, the Court does not find that Defendant was in custody because he was not allowed to travel within his home without being accompanied by law enforcement, even while using the restroom.  At the time of Defendant's interview, the search warrant was being executed and law enforcement had a legitimate interest to preserve evidence and insure officer safety, especially in light of the fact that there were firearms in the house. (Gov.'s Ex. 8 p. 19).  Law enforcement's restriction of Defendant's movement was not sufficient to rise to the level of "extensive" restraint, such that a reasonable person would have felt he or she was not free to leave. *See Brown*, 441 F.3d at 1349.

For the reasons explained above, the Court finds that Defendant was not in custody and not entitled to *Miranda* warnings.  Accordingly, the Court will not recommend that any evidence be suppressed for law enforcement not informing Defendant of his *Miranda* rights.

**c)  Whether Defendant's statements were made voluntarily**

Defendant argues that even if Defendant was not in custody at the time he made his statements, his statements should still be suppressed because they were not made voluntarily. (Doc. 22 p. 9).  The Government contends that Defendant's statements were voluntarily made. (Doc. 27 p. 8).

In order for a suspect's statement to law enforcement officers to be voluntary it must be "the product of an essentially free and unconstrained choice. *Schneckloth v. Bustamonte*, 412 U.S. 218, 225 (1991). "In determining whether a defendant's will was overborne in a particular case, the Court has assessed the totality of all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation." *Id.* at 226.  Some factors that are taken into account include the suspect's education or low intelligence, the lack of any advice to the suspect of his constitutional rights, the length of detention, the repeated and prolonged punishment such as the deprivation of food or sleep. *Id.*  As the Eleventh Circuit noted in *United States v. Mendoza-Cecilia*:

> The focus of the voluntariness inquiry is on whether the defendant was coerced by the government into making the statement: "The relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion or deception." *Colorado v. Connelly,* 479 U.S. 157, 170, 107 S.Ct. 515, 523, 93 L.Ed.2d 473 (1986) (citation omitted). The district court must consider the totality of the circumstances in assessing whether police conduct was "causally related" to the confession. *Miller,* 838 F.2d at 1536. Sufficiently coercive conduct normally involves subjecting the accused to an exhaustingly long interrogation, the application of physical force or the threat to do so, or the making of a promise that induces a confession. *See Colorado,* 479 U.S. at 163 n. 1, 107 S.Ct. at 520 n. 1; *Miller,* 838 F.2d at 1536; *United States v. Castaneda–Castaneda,* 729 F.2d 1360, 1362–63 (11th Cir.1984). Isolated incidents of police deception, *see Castaneda–Castaneda* 729 F.2d at 1362–63; *Frazier v. Cupp,* 394 U.S. 731, 739, 89 S.Ct. 1420, 1424–25, 22 L.Ed.2d 684 (1969), and discussions of realistic penalties for cooperative and non-cooperative defendants, *see United States v. Nash,* 910 F.2d 749, 753 (11th Cir.1990), are normally insufficient to preclude free choice.

963 F.2d 1467, 1475 (11th Cir. 1992).

In this case, the Court finds that Defendant's statement was voluntarily made.  As noted in the previous section above, Defendant was told by law enforcement multiple times that he was not under arrest; that he was not going to jail; and that his interview was strictly voluntary. (Gov.'s Ex. 8 p. 2, 39, 40, 41, 45, 55, 79, 80, 97).  There is no evidence that Defendant's interrogation was

exhaustingly long or that Defendant was threatened with physical force or deprived of food or sleep. To the contrary, Defendant was allowed to smoke cigarettes during the interview and drink water.

Defendant argues that his will was overborne by law enforcement officers' threats that his girlfriend would be held responsible for the child pornography found on his computers if he did not admit that he was responsible. Law enforcement, however, never directly threatened to arrest Ms. Broderick. Defendant had previously stated during the interview that the computer was accessed only by himself and Ms. Broderick. (Gov.'s Ex. 8 p. 6, 26, 28). Although law enforcement did say to Defendant that "so we should take [Ms. Broderick] to jail" when Defendant denied that he was responsible for the child pornography found on the computer, in context, this statement was made as a logical observation that if child pornography was found on the computers accessed by only Defendant or Ms. Broderick, then one of the two of them must be responsible. (Gov.'s Ex. 8 p. 56). Law enforcement made the same observation at other times during the interview without threatening to arrest Ms. Broderick. (Gov.'s Ex. 8 p. 6, 28-29, 49, 62). These statements did not induce Defendant to give an involuntary statement.

Defendant further argues that his statement was not made voluntarily because he relied on the Government's misrepresentation that he would be treated with leniency if he confessed. Defendant refers to a statement made by SA Christopher Tissot[2] as follows:

> When we go to the AUSA, the attorney, with everything and I'm telling you, I'm not just [expletive] you, the first they're gonna listen is the energy[3] and they're gonna know you're lying. And just listen, even you if you're not. And they're gonna, they're not gonna cut you any breaks because they're gonna say he didn't

---

[2] SA Enterline identified the "unidentified male" in the transcript of Defendant's interview as Christopher Tissot during her testimony at the second motion to suppress hearing. (Tr. 2 p. 75).

[3] SA Enterline also testified that the word transcribed as "energy" was actually supposed to be "investigations". (Tr. 2 p. 76).

take responsibility.  Now listen, the ones we do in the past, the interviews when the people come up front and forward, they're the ones that get breaks.

(Gov.'s Ex. 8 p. 80).

Promises of leniency are relevant to determining whether a confession was voluntary and, depending on the totality of the circumstances, may render the statement coerced. *Clanton v. Cooper*, 129 F.3d 1147, 1159 (10th Cir. 1997).  "[A] promise of leniency may render a confession involuntary if it was sufficiently compelling and linked to the confession so that it could be said that the defendant's will was overcome by the offer." *Id.*

In this case, under the totality of the circumstances described above, the Court finds that SA Tissot's statement did not render Defendant's statement involuntary.  Even after SA Tissot's alleged promise of leniency, Defendant continued to deny that he had used Limewire to intentionally download child pornography.  Thus, the Court finds that SA Tissot's alleged promise of leniency was not sufficiently compelling or linked to Defendant's statements to demonstrate that they were not the product of Defendant's free will.  Therefore, the Court determines that Defendant's statement was made voluntarily and that the statement should not be suppressed.

**IT IS RESPECTFULLY RECOMMENDED THAT:**

Defendant's Motion to Suppress (Doc. 22) be **DENIED**.

**Respectfully recommended** in Chambers in Fort Myers, Florida on November 12, 2014.

DOUGLAS N. FRAZIER
UNITED STATES MAGISTRATE JUDGE

**NOTICE TO PARTIES**

Failure to file and serve written objections to the proposed findings and recommendations contained in this report within fourteen (14) days from the date it is served on the parties shall bar an aggrieved

party from a de novo determination by the District Court of issues covered in the report, and shall bar the party from attacking on appeal factual findings in the report accepted or adopted on appeal by the District Court except upon grounds of plain error or manifest injustice. 28 U.S.C. § 636(b)(1)(C); Local Rule 6.02

Copies furnished to:

Counsel of Record
Unrepresented Parties